UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

JUDY Z.,                            )
                                   )
            Plaintiff,              )
                                   )
        v.                         )        No. 2:20-cv-00211-DLP-JRS
                                   )
ANDREW M. SAUL,                    )
                                   )
            Defendant.             )

### ORDER

Plaintiff Judy Z. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d). For the reasons set forth below, the Court hereby **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further consideration.

## I.   PROCEDURAL HISTORY

On October 28, 2016, Judy filed her application for Title II DIB. (Dkt. 17-2 at 158-64, R. 158-64). Judy alleged disability resulting from depression, anxiety, irritable bowel syndrome, fibromyalgia, and diabetes. (Dkt. 17-2 at 176, R. 176). The Social Security Administration ("SSA") denied Judy's claim initially on February 1, 2017, (Dkt. 17-2 at 77, R. 77), and on reconsideration on May 11, 2017. (Dkt. 17-2 at 89, R. 89). On May 23, 2017, Judy filed a written request for a hearing, which was granted. (Id. at 105, R. 105).

1

On December 6, 2018, Administrative Law Judge ("ALJ") Ronald T. Jordan conducted a hearing, where Judy and vocational expert Matthew Lampley appeared in person and by phone, respectively. (Dkt. 17-2 at 40, R. 40). On February 7, 2019, ALJ Jordan issued an unfavorable decision finding that Judy was not disabled. (Dkt. 17-2 at 16-32, R. 16-32). Judy appealed the ALJ's decision and, on March 2, 2020, the Appeals Council denied Judy's request for review, making the ALJ's decision final. (Dkt. 17-2 at 1, R. 1). Judy now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. § 1383(c)(3).

## II.   STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB only after she establishes that she is disabled. To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that she is not able to perform the work she previously engaged in and, based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a). The ALJ must consider whether:

2

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves her unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1520 (a negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and if not, at step

five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id*. The Commissioner must then establish that the claimant – in light of her age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Judy is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge

between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

## III.   BACKGROUND

### A. Factual Background

Judy was forty-nine years old as of her March 23, 2016 alleged onset date. (Dkt. 17-2 at 172, R. 172). She has an Associate degree. (Id. at 41, R. 41). She has

relevant past work history as a baker helper and order filler. (Dkt. 17-2 at 58, R. 58).

**B. Judy's Medical History**

On February 11, 2015, Judy returned to her gastroenterologist, Dr. Nicholas Rogers, for a follow-up on her abdominal pain. (Dkt. 17-4 at 114, R. 469). She had an extensive gastrointestinal evaluation which included endoscopy, colonscopy, CT enteroclysis, video capsule endoscopy, and an MRCP (MRI for bile and pancreatic ducts), all of which were normal. (Id.). Dr. Rogers noted that further testing was not required at this time. (Id.). Her prescription dosage for Notriptyline had been increased previously, which caused her to experience constipation, so Dr. Rogers lowered the dosage back to 50mg. (Id. at 115, R. 470). For her hernia, she was referred to general surgery. (Id.). On April 21, 2015, Dr. Rogers filled out a medical certification noting that Judy needed to be off work for FMLA leave from March 28, 2015 through May 4, 2015 due to her irritable bowel syndrome. (Dkt. 17-3 at 58-60, R. 328-30). Dr. Rogers stated that Judy had attacks of abdominal pain and diarrhea which prevent her from completing most of her job duties for extended amounts of time. Dr. Rogers concluded that it was medically necessary for her to rest and be near a bathroom. (Id. at 60, R. 330).

On August 24, 2016, Judy presented to her primary care physician Dr. Troy Quiz for her complaints of abdominal and lower back pain. (Dkt. 17-4 at 81, R. 436). Dr. Quiz noted that she has a history of irritable bowel syndrome and previous cholecystectomy in 2012. (Id.). Dr. Quiz included diagnoses of upper abdominal

pain, low back pain, irritable bowel syndrome with diarrhea, and diabetes mellitus, and ordered a CT scan of her abdomen and pelvis. (Id. at 84, R. 439). For her IBS, Dr. Quiz prescribed a trial of Viberzi. (Id.).

On September 28, 2016, Judy returned to Dr. Rogers for a follow-up on her abdominal pain and IBS. (Dkt. 17-4 at 104-106, R. 459-61). When Dr. Rogers last saw Judy in 2015, her symptoms were relatively well controlled and her main concern was a hernia. (Id. at 104, R. 459). Since that time, her stress level had increased in having to care for her sick mother, which had worsened her abdominal pain and diarrhea. (Id.). She had stopped taking the trial of Viberzi prescribed by her primary care physician because it caused her to feel constipated. (Id.). Dr. Rogers prescribed Nortriptyline for Judy's IBS symptoms. (Id. at 106, R. 461).

On January 21, 2017, Dr. Jared Outcalt performed a mental status examination at the request of the SSA. (Dkt. 17-4 at 118-125, R. 473-80). Judy reported struggles with depression and anxiety, noting that her depressed moods could last days and force her to sleep for several days at a time. (Id. at 118-19, R. 473-74). She reported that her increasing anxiety forced her to stop driving, and that she avoided public situations so that she does not have to talk to other people. (Id. at 119, R. 474). She further stated that her depression and anxiety had increased in recent years after the death of her father and the increase of her IBS symptoms. (Id.). She noted that her IBS problems lead to an avoidance of social situations. (Id. at 120, R. 475). She stated that she left her last job at Wal-Mart in 2016 because she had been on medical leave for almost a year and had consistently

7

had trouble keeping up with her production goals because she was spending too much time in the bathroom each day. (Id. at 121, R. 476). Dr. Outcalt included diagnoses of adjustment disorder with mixed anxiety and depressed mood, occupational problems, and other psychosocial and environmental problems. (Id. at 124, R. 479). Dr. Outcalt concluded that Judy is able to learn, remember, comprehend, and carry out complex instructions; make appropriate judgments or complex work-related decisions; attend to conversation and respond appropriate and timely, with concentration remaining intact during more cognitively demanding tasks; and would not experience difficulty handling routine changes at work. (Id.).

On January 24, 2017, Dr. Harischandra Rathod performed a physical examination of Judy at the request of the SSA. (Dkt. 17-4 at 128, R. 483). Judy reported she was seeking disability dur to her fibromyalgia, IBS, depression, and anxiety. (Id.). As to her IBS, she reported that the symptoms began approximately four years earlier, were moderate in severity, and were exacerbated by stress. (Id.). Dr. Rathod concluded that Judy has the ability to perform activities involving sitting, standing, moving about, and carrying. (Id. at 133, R. 488).

On February 21, 2017, Judy presented to the Hamilton Center for an initial assessment for mental health therapy. (Dkt. 17-4 at 285-292, R. 640-47). She reported that she had been experiencing anxiety for most of her life, that the telephone is a particular anxiety stressor, and that she stopped driving due to anxiety about getting lost in a familiar place. (Id. at 285, R. 640). Her current symptoms of anxiety included feeling restless, irritability, easily fatigue, periodic

8

chest pain, and difficulty concentrating. (Id.). Her symptoms of depression included feeling sad, overeating, low self-esteem, easily fatigued, and trouble with concentration. (Id. at 285-86, R. 640-41). Judy reported that she does not leave the house alone and that she spends the majority of her time at home and in her bedroom alone. (Id. at 291-92, R. 646-47). Judy was diagnosed with generalized anxiety disorder and persistent depressive disorder, and recommended for individual therapy twice per month. (Id.).

On March 2, 2017, Judy returned to Dr. Rogers for a follow-up on her IBS. (Dkt. 17-4 at 141, R. 496). She reported that the Nortriptyline had helped her abdominal pain, but that she was still bothered by frequent loose bowel movements. (Id.) She noted that she had at least 3-4 bowel movements throughout the day and could spend up to 2 hours in the bathroom at a time. (Id.) She had tried medications for diarrhea in the past, but they caused her to become constipated. (Id.). Dr. Rogers planned to continue Judy on her current dose of Nortriptyline and add a trial of WelChol (diarrhea treatment drug). (Id. at 143, R. 498).

Judy returned to Hamilton Center for mental health therapy on March 10, March 21, and April 19, 2017. (Dkt. 17-4 at 293-95, R. 648-650). Judy noted that being around other people and talking on the telephone were continued triggers, as well as just leaving the house. (Id.). Judy continued to explore her anxiety triggers and begin to work on her goal of getting her life back. (Id.).

On April 18, 2017, Judy presented to Dr. Adelle Maynard-Watts for a consultation as to her increasing memory loss, confusion, and frequent falls. (Dkt.

17-4 at 269-70, R. 624-25). Judy reported getting lost while driving, mixing up words while speaking, difficulty focusing, and difficulty remembering names. (Id. at 270, R. 625). Dr. Maynard-Watts ordered a brain MRI, EEG, and labwork, and advised Judy to be cautious when walking and engage in cognitive activities such as crossword puzzles, sudoku, reading, and writing. (Id. at 274, R. 629). Judy underwent an MRI of the brain on May 2, 2017 due to her complaints of memory loss, confusion, and frequent falls, and test revealed no acute findings. (Dkt. 17-4 at 256, R. 611). An EEG was performed on June 1, 2017, which revealed no acute findings other than tachycardia. (Dkt. 17-4 at 277, R. 632). Also on June 1, 2017, Judy returned to Dr. Maynard-Watts to discuss the test results. (Dkt. 17-4 at 281, R. 636). Judy reported that her memory had improved and that she had not had any episodes of confused driving since the previous visit in April. (Dkt. 17-4 at 283, R. 638). Judy was advised on stress reduction and memory loss, and recommended to see cardiology for an evaluation of her tachycardia. (Id.).

On June 30, August 4, August 18, September 1, September 18, and September 27, 2017, Judy returned to Hamilton Center for mental health therapy. (Dkt. 17-4 at 297-99, R. 652-54; Dkt. 17-5 at 1-3, R. 655-57). Judy reported that she had been getting out of the house more and was able to go shopping with her family. (Dkt. 17-4 at 299, R. 654.). She also noted that getting out of the bedroom and dressed for the day had increased her daily motivation. (Id.). Judy noted that her anxiety is better when she is engaged in routine activities. (Dkt. 17-5 at 2, R. 656). On December 23, 2017, Judy presented to Putnam County Hospital with complaints

10

of abrupt, severe abdominal pain. (Dkt. 17-4 at 210, R. 565). She was diagnosed with an acute urinary tract infection and released home. (Id. at 212-13, R. 567-68).

On February 28, 2018, Judy returned to Dr. Rogers for a follow-up on her abdominal pain. (Dkt. 17-4 at 150, R. 505). She stated that she had been experiencing several months of sharp abdominal pain, but no change in her diarrhea symptoms. (Id.). Dr. Rogers concluded that a repeat endoscopy might be warranted, to look for any gastric or ulcer disease that may be causing the abdominal pain. (Id. at 151, R. 506). Judy also reported heart palpitations and tachycardia, which Dr. Rogers thought may be a side effect of her nortriptyline; Judy did not want to decrease her dosage because it helped manage her IBS pain. (Id. at 152, R. 507). An endoscopy was completed on March 28, 2018, with normal results. (Dkt. 17-4 at 156-57, R. 511-12).

On May 14, 2018, Judy was discharged from the Hamilton Center due to her no longer attending therapy sessions. (Dkt. 17-5 at 5, R. 659). On October 22, 2018, Judy presented to Hendricks Therapy for an initial mental health evaluation. (Dkt. 17-5 at 32, R. 686). Judy reported anxiety starting after the death of her father and worsening a few years prior after the death of her mother. (Id. at 33, R. 687). She reported not being able to work and not leaving the bedroom 3 days out of the week, as well as lethargy, apathy, and anhedonia. (Id.). She was diagnosed with major depressive disorder, recurrent moderate, and unspecified anxiety disorder, and advised to return in 3 weeks. (Id. at 34, R. 688). Judy returned for therapy visits on October 30, 2018 and December 11, 2018. (Dkt. 17-5 at 35-41, R. 689-95). Judy

reported anxiety for most of her life, that increased after the death of her parents. (Id. at 36, R. 690). She noted that her fibromyalgia and IBS exacerbate her anxiety and vice versa. (Id.). She stated that most days she does not leave her bedroom, comb her hair, or change out of pajamas, at that she only gets out of the house at the insistence of her husband or sister. (Id.). She reported a desire to get her life back. (Id.). Judy was recommended for regularly weekly therapy. (Id. at 41, R. 695).

On December 13, 2018, Dr. Rogers transcribed a note stating that Judy's medical condition was unchanged and that he did not expect it to improve over time. (Dkt. 17-5 at 31, R. 685). On December 11, 2018, Nurse Practitioner Pamela Stachler transcribed a note stating that Judy was being seen for medication management for her major depressive disorder, recurrent moderate, and unspecified anxiety disorder. (Dkt. 17-5 at 30, R. 684).

### C. ALJ Decision

In determining whether Judy qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and concluded that Judy was not disabled. (Dkt. 17-2 at 16-32, R. 16-32). At Step One, the ALJ found that Judy had not engaged in substantial gainful activity since her alleged onset date of March 23, 2016. (Id. at 19, R. 19).

At Step Two, the ALJ found that Judy suffered from the following severe impairments: fibromyalgia, irritable bowel syndrome, diabetes, obesity, depression, and anxiety. (Id. at 21, R. 21). The ALJ also found that Judy had a non-severe impairment of sleep apnea. (Id.). When considering the "paragraph B" criteria for

Judy's mental impairments, the ALJ found that Judy had mild limitations with understanding, remembering, or applying information or managing oneself, but moderate limitations with interacting with others and maintaining concentration, persistence, or pace. (Id. at 24-25, R. 24-25).

At Step Three, the ALJ found that Judy's impairments did not meet or medically equal the severity of one of the listed impairments in the Listings. (Dkt. 17-2 at 21-25, R. 21-25). The ALJ determined that Judy's impairments did not meet or medically equal the severity of Listings 5.06 or 5.08 for her irritable bowel syndrome; Listing 9.00 for her diabetes; Listing 14.09 and Social Security Ruling 12-2p for her fibromyalgia; and Listings 12.04 and 12.06 for her depression and anxiety. (Id.). The ALJ further evaluated Judy's obesity according to Social Security Ruling 02-1p. (Id. at 23, R. 23).

After Step Three but before Step Four, the ALJ found that Judy had the residual functional capacity ("RFC") to perform medium work with the following exertional limitations: can lift, carry, push, and/or pull up to 50 pounds occasionally and up to 25 pounds frequently; stand and walk for six hours in an eight hour workday; sit for six hours in an eight hour workday; frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and occasionally climb ladders, ropes, and scaffolds. (Dkt. 17-2 at 25-26, R. 25-26). The ALJ also assigned the following non-exertional limitations: limited to work involving simple, repetitive tasks requiring occasional independent judgment regarding basic work processes;

work goals from day to day should be static and predictable; and only occasional contact with coworkers, supervisors, and the general public. (Id.).

At Step Four, the ALJ concluded that Judy is capable of performing her past relevant work as an order filler as nationally performed. (Dkt. 17-2 at 31, R. 31). The ALJ thus concluded that Judy was not disabled. (Id.).

## IV.  ANALYSIS

Judy challenges the ALJ's decision on two[1] grounds. First, Judy argues that the ALJ's RFC does not account for her severe irritable bowel syndrome and that the ALJ unreasonably discounted the opinion of her treating gastroenterologist as to her irritable bowel syndrome. (Dkt. 20 at 1, 7-15; Dkt. 27 at 1-11). Second, Judy contends that the ALJ erred by not accounting for her moderate limitations in maintaining concentration, persistence, and pace in the RFC. (Dkt. 20 at 15-17; Dkt. 27 at 11-12). The Court will consider these arguments in turn.

### A. Unsupported RFC

Judy first argues that the ALJ's RFC assessment does not adequately account for her irritable bowel syndrome ("IBS") symptoms. (Dkt. 20 at 7-15). Specifically, Judy asserts that the ALJ improperly discounted the opinion of her treating gastroenterologist, Dr. Rogers, and failed to include appropriate limitations to address her persistent diarrhea. (Id.). Judy proposes further RFC limitations related to immediate bathroom access and time off-task to use the bathroom throughout the day. (Id.). In response, the Commissioner maintains that the ALJ's

---

[1] Judy presents three arguments in the briefing, but because the first two arguments are related, the Court will address them together.

RFC is supported by substantial evidence and the ALJ provided good reasons for discounting the opinion of Dr. Rogers. (Dkt. 25 at 7-13).

The ALJ mentions Judy's IBS at various points in the opinion. First, when classifying her IBS as severe, the ALJ notes: "As to her irritable bowel, her abdomen is found to be soft and nontender with normoactive bowel sounds and no rebound, guarding, or masses. On occasion, when she has not been on her medications and has an increase of symptoms, tenderness is noted, but the remaining findings are normal." (Dkt. 17-2 at 19, R. 19). During the RFC analysis, the ALJ states: "[t]he evidence shows that after the claimant underwent surgery that included rectocele repair in July 2015, she reported an improvement in her irritable bowel symptoms. In March 2017, she reported resolution of her symptoms after she was restarted on her medications. It is also noted the claimant has had periods of over one year in between physician visits for her physical impairments and, despite this, examination findings have been normal." (Dkt. 17-2 at 27, R. 27). Finally, the ALJ addressed Judy's IBS when weighing her treating gastroenterologist's medical opinion:

> Dr. Rogers stated that due to irritable bowel syndrome, the claimant . . . needs a job . . . that permits ready access to a restroom as she has less than one minute notice that she needs to use the restroom. He added this happens every 15 minutes with the claimant in the restroom for at least five to 10 minutes at a time. . . . Although a long-time treating physician and generally entitled to more weight, the opinion of Dr. Roger is given only some weight. The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision and in this physician[']s own treatment records, there exist good reasons for questioning the reliability of the claimant's subjective complaints as examination findings from multiple sources show the claimant's symptoms are generally controlled.

(Dkt. 17-2 at 29-30, R. 29-30).

The Court is troubled by the ALJ's discussion of Judy's IBS because that discussion fails to provide a logical bridge from the evidence to his conclusions. First, the ALJ states that Dr. Rogers's opinion is based on an uncritical acceptance of Judy's verbatim complaints and is inconsistent with his own treatment records, yet cites to no record evidence that would support this contention. Second, on the Court's review, the ALJ misstates Dr. Rogers's assertion that his medical opinion was based on Judy's complaints; Dr. Rogers noted that only his conclusion that Judy can tolerate low stress work was based on his conversations with Judy, and affirmatively stated that Judy's impairments are reasonably consistent with her symptoms and the functional limitations. (Dkt. 17-3 at 49-50, R. 319-20). Additionally, the medical evidence, both from Dr. Rogers and in the remainder of the record, does not support the ALJ's statement that Judy's symptoms were resolved or generally controlled. While it is reasonably accurate to say that Judy's IBS pain was resolved, from even a cursory review of the record, it is clear that Judy's IBS diarrhea is not resolved. The ALJ fails to mention Judy's diarrhea or her need for bathroom breaks, despite abundant record evidence to support such a complaint.

The following record evidence demonstrates both that Judy's IBS diarrhea symptoms were not generally controlled and her need for bathroom breaks. On September 28, 2016, Judy reported to Dr. Rogers that while her abdominal pain and diarrhea had been relatively well controlled in 2015, in the past several months

16

those symptoms had been increasing in severity. (Dkt. 17-4 at 145, R. 500). Judy reported to the state agency mental status examiner Dr. Outcalt on January 21, 2017 that she had trouble keeping up at work in 2015 because she was always in the bathroom and could not meet her production goals. (Dkt. 17-4 at 121, R. 476). On January 24, 2017, Judy was evaluated by Dr. Harischandra Rathod for a physical exam at the request of the SSA. (Dkt. 17-4 at 128-134, R. 483-490). She reported moderate diarrhea occurring over the last four years that was exacerbated by stress. (Id.). At a follow-up visit with Dr. Rogers on March 2, 2017, she reported that the Nortriptyline had helped her abdominal pain, but that she continued to be bothered by frequent loose bowel movements that required her to spend up to two hours in the bathroom at a time. (Dkt. 17-4 at 141, R. 496).

On March 3, 2017, Dr. Rogers, the only doctor treating Judy's IBS, completed a Medical Source Statement indicating that Judy would need to be off-task 25% or more of the workday and that Judy experiences good days and bad days. (Dkt. 17-3 at 49-50, R. 319-20). Dr. Rogers also noted that Judy would need to take unscheduled bathroom breaks every 15 minutes that last 5-10 minutes. (Id. at 49, R. 319). At a mental health therapy appointment on October 30, 2018, Judy reported that her fibromyalgia and IBS exacerbate her anxiety and vice versa. (Dkt. 17-5 at 36, R. 690). On February 28, 2018, Judy saw Dr. Rogers after experiencing several months of sharp abdominal pain, but no change in her diarrhea symptoms. (Dkt. 17-4 at 150, R. 505). Judy also reported heart palpitations and tachycardia, which Dr. Rogers thought may be a side effect of her nortriptyline; Judy did not

want to decrease her dosage because it helped manage her IBS pain. (Id. at 152, R. 507). The Commissioner has failed to direct the Court to any evidence that supports the ALJ's conclusion that Judy's IBS diarrhea symptoms were generally controlled, negating her need for bathroom breaks.

At the disability hearing on December 6, 2018, Judy testified that she had to quit working at Wal-Mart because she was in the bathroom too often to keep up with her work requirements. (Dkt. 17-2 at 43, R. 43). The ALJ asked Judy if her diarrhea had improved, and she responded that while the Nortriptyline had helped resolve her pain, her diarrhea had not improved. (Id. at 43-44, R. 43-44). The ALJ continued to question Judy about whether she had seen a gastroenterologist, taken over the counter medications, or scheduled her meals in an effort to control her IBS symptoms. (Id. at 44-45, R. 44-45). Judy responded that she had seen her treating gastroenterologist, Dr. Rogers; had tried every test, including endoscopy and colonoscopy; and had tried different diets and various medications, but nothing had helped her diarrhea. (Id.). She further testified that her IBS is triggered by stress and anxiety, which is generally caused by her leaving the house and interacting with others. (Id. at 45-46, R. 45-46). Judy testified that on a good day, she has two bouts of diarrhea, and that she has approximately two good days per week; on a bad day, however, she has eight to ten bouts of diarrhea. (Dkt. 17-2 at 51, R. 51). Dr. Rogers submitted a follow-up statement on December 13, 2018 stating that Judy's "medical condition is unchanged. I do not expect it to improve over time." (Dkt. 17-5 at 31, R. 685).

For the three years prior to and at the disability hearing, Judy consistently reported difficulties with diarrhea and the need for numerous, unscheduled bathroom breaks throughout the day. She reported it to her treating physician, mental health therapist, state agency consulting physician, and to the ALJ himself. Despite this consistent reporting, however, the ALJ never once mentions Judy's persistent diarrhea or the need for bathroom breaks. Judy testified that she would often spend at least 15-20 minutes in the bathroom per visit, and Dr. Rogers opined that Judy would need to spend 5-10 minutes in the bathroom every 15 minutes. This question is vital to the evaluation of Judy's claim, because the vocational expert testified that a worker could only be off-task for 10% of the workday and that no work would be available to an individual who needed to take unscheduled breaks every 15 minutes that would last 5-10 minutes. (Dkt. 17-2 at 60-61, R. 60-61). Thus, the issue of the frequency and duration of Judy's bathroom breaks is highly relevant to and likely outcome determinative for Judy's request for benefits. *See Manker v. Berryhill,* No. 16 C 10704, 2017 WL 6569719, at *4 (N.D. Ill. Dec. 22, 2017) (collecting cases related to the ALJ's treatment of claimant's diarrhea and need for bathroom breaks).

Judy also argues that the ALJ improperly discounted the opinion of her treating gastroenterologist, Dr. Rogers. Under the "treating physician" rule, which applies to Judy's claim, an ALJ should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2); *Gerstner v.*

*Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that the treating physician rule applies only to claims filed before March 27, 2017). An ALJ is authorized, however, to reject a treating physician's opinion, so long as he offers "good reasons" for doing so. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). If an ALJ does not give a treating physician's opinion controlling weight, the ALJ is required to consider the length, nature, and extent of the treatment relationship; the frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion. *Scott*, 647 F.3d at 740 (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)); 20 C.F.R. § 404.1527(c).

    The ALJ notes that Dr. Rogers is a treating physician and that he is Judy's "long-time treating physician," but does not note that the length was almost 7 years at the time of the hearing or that Dr. Rogers is a gastroenterologist, a specialty that frequently treats patients with IBS. (Dkt. 17-2 at 29-30, R. 29-30). The ALJ similarly does not seem to consider the types of tests performed or the consistency and supportability of Dr. Rogers's opinion. (Id.). The Commissioner, however, claims that the ALJ's decision to discount Dr. Rogers's opinion was justified because Dr. Rogers based his conclusions on conversations with the Plaintiff, Judy's objective testing was normal, and the record does not support greater limitations than those assigned by the ALJ. (Dkt. 25 at 11-13).

    As discussed previously, both the ALJ and the Commissioner misstate Dr. Rogers's Irritable Bowel Syndrome Medical Source Statement; when discussing

20

Judy's functional limitations Dr. Rogers based his conclusion that Judy required low stress work on his conversations with her – there is no indication, however, that the remainder of his conclusions were based solely on conversations with Judy. Second, Dr. Rogers noted that "all testing, including bloodwork, upper endoscopy, colonoscopy, and CT, have been normal, as expected with IBS." (Dkt. 17-3 at 47, R. 317). Dr. Rogers is the only treating specialist in the record, with a history of treating patients with IBS, and the ALJ's decision to discount Judy's IBS symptoms and Dr. Rogers's opinion due to normal objective test results, where the treating specialist has indicated normal test results are expected, is not justified.

Finally, the ALJ notes that Judy's IBS symptoms are generally controlled. While it is true that Judy's IBS pain symptoms are generally controlled, the same cannot be said for her IBS diarrhea symptoms. As discussed previously, the record contains numerous examples to show that Judy's IBS diarrhea symptoms are persistent and uncontrolled by medication, diet, or other treatment and would benefit from additional work restrictions to time off-task and unscheduled bathroom breaks. It seems that the ALJ only considers Judy's pain symptoms in his opinion, without any evaluation of how her diarrhea symptoms affect her work abilities. Without such a consideration, the ALJ did not provide a logical bridge and the Court cannot follow the ALJ's analysis from the evidence to his conclusions. As such, the Court finds remand is appropriate on this issue.

## B. Concentration, Persistence, and Pace

Judy next argues that the ALJ failed to account for her moderate limitations in maintaining concentration, persistence, or pace in the RFC assessment and hypotheticals posed to the vocational expert. (Dkt. 20 at 15-17). In response, the Commissioner asserts that the ALJ adequately accounted for Judy's limitations in the RFC and hypotheticals by limiting her to simple, repetitive tasks requiring occasional independent judgment regarding basic work processes, static and predictable work goals from day to day, and only occasional contact with coworkers, supervisors, and the general public. (Dkt. 25 at 14-18).

When crafting a claimant's RFC, an ALJ must incorporate all of a claimant's limitations in the assessment. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). Both an RFC assessment and the hypothetical posed to the vocational expert must account for documented limitations of concentration, persistence, or pace. *Paul v. Berryhill*, 760 F. App'x 460, 465 (7th Cir. 2019) (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018)). Furthermore, if an ALJ relies on testimony from a vocational expert ("VE"), the hypothetical question the ALJ poses to the VE "must incorporate all of the claimant's limitations supported by the medical evidence in the record." *Varga*, 794 F.3d at 813. The hypothetical question posed to the vocational expert is sufficient if it is supported by the record. *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) (citing *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987)).

As noted above, in the Step Two analysis, the ALJ found that Judy has moderate limitations in two of the four "paragraph B" criteria – interacting with others and maintaining concentration, persistence, or pace. (Dkt. 17-2 at 24-25, R. 24-25). The ALJ's RFC limited Judy to simple, repetitive tasks requiring occasional independent judgment regarding basic work processes; static and predictable work goals from day to day; and only occasional contact with coworkers, supervisors, and the general public. (Dkt. 17-2 at 25-26, R. 25-26). During Judy's disability hearing, the ALJ posed a hypothetical question to the vocational expert using language nearly identical to her eventual mental RFC assessment. The ALJ posed the following question, in relevant part, to the vocational expert:

> The nature of the work should be limited to simple, repetitive tasks requiring only occasional independent judgement with regard to primary work processes, with static and predictable work goals from day to day, and occasional contact with the public, coworkers, and supervisors. With these limitations, could either of her past jobs be performed?

(Dkt. 17-2 at 58-59, R. 58-59). Judy contends that this hypothetical similarly does not address her moderate limitations with maintaining concentration, persistence, or pace. (Dkt. 20 at 15-17).

As an initial matter, the Court notes that the Plaintiff's briefing is devoid of any specific discussion as to how the ALJ's RFC assessment failed to accommodate her concentration, persistence, or pace. Perhaps more importantly, Judy has proposed no additional work restrictions that she claims would address her limitations with concentration, persistence, or pace. The Seventh Circuit has found that when RFC restrictions adequately account for psychological symptoms and the

23

claimant does not present any additional restrictions that would address the limitations in concentration, persistence, or pace, the ALJ's RFC assessment should be upheld. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (ALJ's RFC appropriately addressed concentration, persistence, and pace where claimant hypothesized and the record supported no additional work restrictions); *Saunders v. Saul*, 777 F. App'x 821, 825 (7th Cir. 2019) (RFC upheld where assessment was supported by medical expert testimony and claimant proffered no additional restrictions). Accordingly, the Court will address whether the ALJ's RFC restrictions adequately account for Judy's psychological symptoms.

On January 21, 2017, Judy was examined by state agency physician Dr. Outcalt. (Dkt. 17-4 at 118-124, R, 473-79). Judy reported consistent depression and anxiety symptoms, such as an inability to enjoy herself, a fear of driving, and an avoidance of any social situations outside of her immediate family. (Id. at 118-19, R. 473-74). She further noted that her IBS caused her considerable anxiety, which caused her to avoid social situations, which in turn brought on her depressive symptoms. (Id. at 119, R. 474). Dr. Outcalt concluded that Judy could learn, remember, comprehend, and carry out complex instructions; make appropriate judgments on complex work-related decisions; attend to conversation and respond appropriately and timely, with concentration remaining intact during more cognitively demanding tasks; handle routine changes at work without experiencing difficulty; and interact appropriately with others. (Id. at 124, R. 479).

When Judy's application was reviewed initially on January 23, 2017, state agency consultant Dr. S. Hill concluded that Judy had no limitations in her ability to adapt or manage herself, but did have mild difficulties with her ability to understand, remember or apply information; interact with others; and maintain concentration, persistence, or pace. (Dkt. 17-2 at 71, R. 71). On May 11, 2017, Dr. Kenneth Neville agreed and adopted Dr. Hill's previous assessment. (Dkt. 17-2 at 83, R. 83).

The ALJ gave some weight to the opinions of the state agency reviewing physicians and Dr. Outcalt because their opinions did not have the benefit of reviewing Judy's later outpatient mental health treatment. (Dkt. 17-2 at 30-31, R. 30-31). That updated information included Judy's testimony that her anxiety improves when she is engaged in routine activities, (Dkt. 17-5 at 2, R. 656); evidence that Judy experienced considerable improvement in her symptoms before she had voluntarily stopped attending her mental therapy sessions at Hamilton Center, (Dkt. 17-5 at 5, R. 659); and Judy's report to her mental health provider in November 2018 that she experienced concentration issues related to her anxiety, but that her symptoms improve with therapy and medication. (Dkt. 17-5 at 36, R. 690). Additionally, the ALJ accepted verbatim Judy's reported statements about her difficulties with concentration, persistence, and pace that were submitted to the SSA in her Function Report on December 6, 2016. (Dkt. 17-2 at 184-191, R. 184-191). To address the information contained in the updated record, the ALJ found that Judy was moderately limited with respect to maintaining concentration,

persistence, and pace, and accordingly assigned additional limitations beyond those assessed by the state agency reviewing and consulting physicians.

The ALJ addressed Judy's concentration, persistence, and pace throughout the opinion. During the Step Three analysis, the ALJ specifically noted that

> [w]ith regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. As noted above, the claimant has reported she is able to follow written instructions if she is able to read them a few times and her ability to follow verbal instructions decreases the more complex they are. The claimant also said she can pay attention for only 10 minutes at a time, but that she is able to complete tasks that she begins. . . . Thus, it is found there is no functional consequence of the claimant's limitation in this area beyond an inability to sustain detailed or complex work processes, and, in the case at hand, a restriction to simple repetitive tasks encompasses that restriction."

(Dkt. 17-2 at 24-25, R. 24-25). The ALJ further stated that Judy's moderate deficiency with maintaining concentration, persistence, or pace is addressed by the restriction to simple, repetitive tasks. (Id. at 25, R. 25). During the RFC analysis, the ALJ noted that the state agency reviewing and consulting physicians' opinions merited some weight because their opinions were not based on a complete record, and that an updated review of Judy's mental health history warranted additional restrictions. (Id. at 30-31, R. 30-31). During Judy's disability hearing, the ALJ posed a hypothetical question that reflected the opinions of the state agency physicians, as well as Judy's updated medical history which showed chronic anxiety issues and inconsistent mental health treatment.

Plaintiff is correct that, in some cases, a limitation to simple, repetitive tasks may not be sufficient to capture a claimant's difficulties with concentration,

26

persistence, or pace. *Saunders*, 777 Fed. App'x at 825. Limitations to simple, repetitive tasks may be sufficient in certain cases, however, such as where the claimant offers no further restrictions that should have been included in the ALJ's RFC. *Jozefyk*, 923 F.3d at 498; *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019). As discussed previously, Judy has proffered no additional mental restrictions that she claims should have been included in the RFC. The ALJ here accepted Judy's testimony on her ability to maintain concentration, persistence, and pace, assigned limitations that were more restrictive than those identified by the state agency physicians, and tied that evidence to his conclusion that Judy required a work pace and goals restriction. As such, the ALJ's hypothetical to the vocational expert and RFC assessment were supported by substantial evidence.

## V.   CONCLUSION

For the reasons detailed herein, the Court **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four). Final judgment will issue accordingly.

So ORDERED.

Date: 5/18/2021

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email